THE STATE ex rel. JULIUS E. GREFFET and ROSALIE GREFFET v. GEORGE H. WILLIAMS, Judge, ST. LOUIS ELECTRIC TERMINAL RAILWAY COMPANY, E. RAYMOND KINSEY, BERNARD HUFFT and JOSEPH DARST.

**In Banc, March 30, 1910.**

1. **CONDEMNATION: Consent of City.** A railway company organized under article 2 of chapter 12, Revised Statutes 1899, derives its authority from the State to condemn private lands for railroad purposes, and not from the city in which it is to construct its lines. There is no law requiring a railroad company to first procure the consent of the city to use its streets as a prerequisite to its legal right to condemn private property for railroad purposes.

   *Held,* by GANTT, J., dissenting, that inasmuch as the city has granted to the company only the right to operate a street railway, it must be held to be a street railway only, and cannot fall back on its charter as a steam railroad as its authority to condemn. No railroad company has a right to construct and operate a railway in the streets of a city with-

.out its consent, because both the Constitution and statutes prohibit it from doing so. A street railway has no power to condemn.

2. ———: Interurban Railroad. An interurban electric railway company has all the power that a steam railroad company has to condemn private property for right of way, etc.

Held, by GANTT, J., dissenting, that the statute conferring "on interurban electric railroads" the power of condemnation cannot be held to confer said power on a street railway which by the very term of its charter lies wholly in a city and hence is not interurban.

3. ———: ———: To be Operated as Street Railway: To Carry Freight. The power of a regularly organized and chartered interurban electric railway company to operate a street railway on the streets of the city or to transport freight upon freight trains will not be considered in disposing of its rights to condemn private property for its right of way. The time to determine its right to do those things is when it undertakes to do them.

Held, by GANTT, J., dissenting, that as the Constitution requires the consent of the city to the construction and operation of street railways on its streets, it is not immaterial in a proceeding to condemn private property whether the consent of the city has been obtained, even though the State has conferred the power to condemn in the charter, but the relators have a right to question whether or not the company has obtained the city's consent and whether or not it is a street railway or an interurban electric railway.

## Prohibition.

WRIT DENIED.

· *Kinealy & Kinealy* for relators.

(1) The abutting property-owners, or any of them, have not consented to the construction, maintenance or operation by respondent railroad company of a general railroad for the conveyance of freight, or of other than a street railway, and without that consent respondent railway company cannot operate such a railroad on or across any streets of St. Louis, and

therefore cannot condemn property for such a railroad in that city. R. S. 1899, sec. 6119. (2) The St. Louis Electric Terminal Railway Company cannot lawfully operate a standard railroad carrying freight as well as passengers, or lay tracks for that purpose, or for any other railroad organized under article 2, chapter 12, R. S. 1889, because it has not received the consent of the municipal authorities of St. Louis to do so. R. S. 1899, sec. 1035, clause "fourth," second sentence. (3) The St. Louis Electric Terminal Railway Company cannot condemn property in this city for a railway to carry passengers and freight where its only right to construct or operate a railroad in the city is that conferred by an ordinance permitting it to construct, maintain and operate a street railroad, and a railroad company cannot condemn property for use of another corporation. Railroad v. Railroad, 119 Ala. 105; Railroad v. Byrnes, 119 N. Y. 142; Wilder v. Railroad, 216 Ill. 526; Miller v. Railroad, 88 N. E. 102; Swinney v. Railroad, 59 Ind. 219; Brickles v. Railroad, 134 Wis. 358; David Bradley Mfg. Co. v. Railroad, 229 Ill. 170; Gillette v. Railroad, 228 Ill. 261; Harvey v. Railroad, 174 Ill. 295; Beckman v. Railroad, 112 N. W. 348. (4) The permission or power given respondent to construct, maintain and operate a street railway is not enlarged by the requirements in the ordinance to connect with the bridge or with the Illinois railroads so as to permit it to operate a railroad to carry freight or exercise eminent domain. The city cannot grant corporate franchises; it can only consent or contract on lawful conditions for the use of its streets. State ex rel. v. Railroad, 85 Mo. 275; Dewey v. Railroad, 184 Ill. 426; Shreveport Tr. Co. v. Railroad, 119 La. 759; Railroad v. Railroad, 10 Wall. 38. (5) If respondent has any rights whatever in the streets of St. Louis—which we deny—they are only those of a street railway company acting under an ordinance. Brickles v. Railroad, 134 Wis. 358; David Bradley Mfg. Co. v. Railroad, 229

Ill. 170.  (6)  If respondent railway company be deemed a street railway, it can acquire property in this city only "by purchase, lease or other lawful contract," or by grant.  R. S. 1899, sec. 1187, clauses "seventh" and "fourth;" Railroad v. Putney, 62 Atl. 727.  (7) Respondent as a street railway company cannot locate its tracks outside the streets named in the ordinance in the absence of a statutory provision permitting it to do so.  Hence it could not condemn relator's lot even if a street railway company had power to condemn.  Harvey v. Aurora Co., 174 Ill. 308; Dewey v. Railroad, 184 Ill. 432; R. S. 1899, secs. 1175 and 1187, clause 4.  (8)  A street railway company cannot exercise the power of eminent domain in Missouri.  Railroad v. Railroad, 2 Mo. App. 74; Sams v. Railroad, 174 Mo. 80.  (9)  A railroad company organized for the carriage of freight and passengers, but which has acquired a permissive ordinance to operate a street railway, cannot condemn property for the use of such street railway.  Harvey v. Railroad, 174 Ill. 295; Wilder v. Railroad, 216 Ill. 493; Railroad v. Railroad, 119 Ala. 105; David Bradley Mfg. Co. v. Railroad, 229 Ill. 170.  (10)  A street railway company cannot exercise the power of eminent domain unless by express statutory authority and only to the extent given by the statute.  Elliott on Railroads, p. 57, sec. 1096F; Elliott on Roads and Streets (2 Ed.), sec. 738, p. 798; Railroad v. Putney, 62 Atl. 727; Harvey v. Railroad, 174 Ill. 295; Piedmont Mills v. Railroad, 131 Ga. 144; Thomson-Houston Co. v. Simon, 20 Ore. 60; Dewey v. Railroad, 184 Ill. 426.  (11)  The respondent St. Louis Electric Terminal Railway Company has no authority to construct, maintain or operate any kind of railroad within the limits of the city of St. Louis.  R. S., p. 342, sec. 1035, clause "fourth;" Wilder v. Railroad, 216 Ill. 493; David Bradley Mfg. Co. v. Railroad, 229 Ill. 170.

*Edward C. Crow* for respondents.

(1)   The writ of prohibition will not lie to prevent condemnation proceedings, because of the incapacity of the petitioner to maintain such proceedings, where the circuit court has jurisdiction to condemn property to public use, in the exercise of the right of eminent domain. State ex rel. v. Railroad, 100 Mo. 59. The circuit court in the case at bar had power to entertain proceedings of the general class to which this case belongs, namely, proceedings for the condemnation of property for public use. It therefore had jurisdiction of the subject-matter. State ex rel. v. Railroad, 100 Mo. 61; Postlewaite v. Geislein, 97 Mo. 424.   (2)   Interurban railroad has express statutory power to condemn property to same extent as an ordinary steam railroad. R. S. 1899, sec. 1174a.   (3)   The amendment of 1907 conferring the power of eminent domain upon interurban electric railroads is *in pari materia* with articles 2 and 7 of chapter 12, Revised Statutes 1899, containing the law of eminent domain for steam railroads, and confers on interurban electric railroads all the powers of a steam railroad to condemn property for its use.   Mallott v. Railroad, 108 Fed. 313; Lewis on Eminent Domain (3 Ed.), sec. 404; Garton v. Lampkin, 115 Mo. 33; Lewis' Sutherland on Statutory Construction (2 Ed.), secs. 405, 408, 442; Chappel v. United States, 81 Fed. 764; Postal T. C. Co. v. Railroad, 98 Fed. 190; State ex rel. v. Doring, 173 Mo. 504; Saler v. Barber Asphalt Co., 166 Mo. 504.   Section 1035, Revised Statutes 1899 (being section under which steam railroads are incorporated and receive their power), provides "Sixth, to take and convey persons and property on their railroad by the power or force of steam or of animals or by any mechanical power."   (4)   Respondent St. Louis Electric Terminal Railway is an interurban railroad.   An interurban railway, as commonly understood in the first decade of the twentieth century, means an electric railway operated through

and between different cities and towns and carrying only passengers, or passengers, freight and express. 1 Lewis on Eminent Domain (3 Ed.), sec. 165; Mallott v. Railroad, 108 Fed. 313. (5) The articles of association, the ordinance of St. Louis and the testimony in the case show the respondent railway company is not a street railway company but an interurban electric railway company. (6) It is not necessary that consent of a city to use its streets be first given to enable a legally organized railroad company to condemn private property for its use for a public purpose. Railroad v. Kimball, 61 Cal. 90; Railroad v. Railroad, 87 Ill. 317. (7) The right to condemn comes from the State. Railroad v. Railroad, 87 Ill. 317. (8) It is not competent in this collateral proceeding to consider whether respondent railway company has a right to use the streets of St. Louis. Railroad v. Railroad, 87 Ill. 317; Ulmer v. Railroad, 66 L. R. A. 395; 17 Ency. Pl. & Pr., 409; Sewanee Falls Bridge v. Firk, 23 N. H. 171. A railroad company may be organized under the general railroad law to construct a railroad wholly within a city. Lewis on Eminent Domain (2 Ed.), sec. 256, 107 Ill. 450; St. Louis Transfer Co. v. Railroad Co., 111 Mo. 673.

WOODSON, J.—Relators instituted this proceeding in this court, on August 5, 1909, against the respondents, to prohibit Kinsey, Hufft and Darst, respondents from taking any action as commissioners, appointed by Hon. Geo. H. Williams, one of the judges of the circuit court of the city of St. Louis, to assess compensation to relators for damages sustained by them in a proceeding instituted by the respondent, the St. Louis Electric Terminal Railway Company, for the purpose of condemning a lot of ground owned by relators, situate in the city of St. Louis. Judge Williams was also made a party.

A preliminary writ was ordered and made returnable on the first day of the October Term, 1909, of this court. Respondents filed their return thereto, and relators answered, and raised thereby certain questions of fact. Thereupon, by agreement of parties, this court appointed Hon. Moses Sale, of the city of St. Louis, referee to hear the evidence, make a finding of the facts and report the same to this court. In compliance with that order, the referee took the evidence, found the facts and reported them to this court. While the record covers several hundred pages of printed matter, yet the facts, insofar as they are material, are comparatively few, and practically undisputed, which are substantially as follows:

The respondent, the St. Louis Electric Terminal Railway Company, is a corporation organized and incorporated under the laws of this State in pursuance to article 2, chapter 12, Revised Statutes 1899, with its principal office in the city of St. Louis. The charter of said company authorized and empowered it to construct, maintain and operate a standard gauge railroad (as stated in the language of counsel for respondents) "for the conveyance of persons and property in the State of Missouri from a point on or near the west bank of the Mississippi river, in the city of St. Louis, running thence in a general westerly, thence southerly, thence easterly and thence southerly direction, to a point at or near the west bank of the Mississippi river, with either a single or double track, with spurs, switches, side tracks, branch lines, terminal facilities and connections from points on the aforesaid route to and connecting said line with the various bridges, bridge terminals, ferries, wharves, ways, landings, railroad yards, depots, manufacturing and shipping establishments which now are or may hereafter be constructed or built, providing complete and continuous terminal facilities, connections and accommodations within the city of St. Louis for said railway; and said railway was designed

and intended for use in connection with the bridge of the St. Louis Electric Bridge Company over the Mississippi river which is now nearing completion, and said road and said bridge are intended to be used in connection with and as a part of the following named interurban railroad systems in Illinois, *viz.*: The Illinois Central Traction Company, the St. Louis & Springfield Railway Company, the St. Louis & Northeastern Railway Company and the Danville & Edwardsville Terminal Railroad Company, corporations organized under the laws of the State of Illinois, in the State of Illinois, and which said Illinois corporations have constructed a system of interurban electric railways in Illinois several hundred miles in length, extending from a point of connection with the St. Louis electric bridge in the town of Venice, Illinois, on the eastern bank of the Mississippi river opposite St. Louis, and connecting various towns and cities in Illinois with each other, and which said system of interurban electric railways in Illinois in connection with the St. Louis Electric Terminal Railway in Missouri is designed and intended to connect the city of St. Louis by means of said interurban electric railway companies and said bridge across the Mississippi river with different and distant towns and cities in Illinois and other States.''

By an ordinance duly enacted and approved April 6, 1907, the city of St. Louis authorized the respondent railway company to construct, operate and maintain a single or double-track electric railway for the carriage of passengers, mail and express matter, over, along and across certain designated streets in the city of St. Louis, prescribing the conditions on which said railway shall be operated and prescribing penalties for the violation thereof. The first section thereof reads as follows:

''Section One. Permission and authority are hereby given and granted to the St. Louis Electric Terminal Railway Company, a corporation organized under the

laws of the State of Missouri, its successors and assigns, to lay down, construct, operate and maintain a single or double-track street railway, as hereinafter provided, on, over and along the streets designated in section two of this ordinance; and on, over and across all railway tracks, streets, alleys and other highways, bridges and city blocks and other public places along the route hereinafter mentioned; together with all appurtenances and all necessary conduits, wires and poles for the purpose of connecting its power houses with its lines of railway and transmitting its power to points of consumption. For the sole purpose of connecting any of its own stations, depots, yards, car barns or power houses, situated in city blocks immediately adjoining the streets along the route described in section two of this ordinance with its main line of track, said railway company is hereby authorized to construct, operate and maintain such switches and turnouts as may be necessary for such purpose."

By section two of said ordinance, the route of said railway is set forth, as beginning at Farrar and Ninth streets and running on Branch, Twelfth, Ninth, Eleventh, Palm and Twelfth streets to Lucas avenue, and on Linden, Thirteenth and Gay streets, and also over and across all streets and alleys from Ninth street to the Mississippi river, between Farrar and Mallinckrodt streets.

By section three, it was ordained, among other things, that: "The rights and privileges hereby granted to the St. Louis Electric Terminal Railway Company are for the purpose of establishing and maintaining a street railroad in the city of St. Louis in connection with and as a part of the following named interurban systems in Illinois: The Illinois Central Traction Company, the St. Louis and Springfield Railway Company, the St. Louis and Northeastern Railway Company and the Danville and Edwardsville Terminal Railroad, corporations organized under the laws of the

State of Illinois, in the State of Illinois, and which have constructed a system of interurban railways in said State; and it is hereby stipulated and agreed by the said St. Louis Electric Terminal Railway Company, for itself, its successors and assigns, that within two years after the date of the passage and approval of this ordinance, said street railway shall be connected and operated in connection with the said interurban companies."

Section 4 provides: "The St. Louis Electric Terminal Railroad Company may operate its road by electricity or by any other power authorized by ordinance . . . and all its stations or depots shall be located on property leased or owned by said railway company. No trailer shall be operated in connection with any passenger or express cars in said city, and all trains for the carriage of either passengers or express shall consist of a single car."

Section 5 provides that all necessary poles to carry electric wires may be erected and placed "along the curbs of all streets on, over, across or along which said railroad company may be operated under this ordinance." The St. Louis Electric Terminal Company may make needful and convenient changes in construction of needful and convenient curves, etc., in any of the streets or railways in, along or over or across which it may be constructed or operated with permission of the Board of Public Improvements.

Section 7 requires the acceptance of the St. Louis Electric Terminal Railway Company to be filed, and bond given for the observance of this ordinance and all general ordinances in force, or that may be passed with reference to street railways, and to pay damages to adjoining property-owners, and save the city harmless from damages because of the "construction, operation or maintenance of said street railway."

By section 10 the St. Louis Electric Terminal Railway Company agrees to comply with all the general

ordinances and charter provisions of the city of St. Louis affecting the speed and other operating requirements of street railways then in force or hereafter to be enacted and applicable to its line of road or any part thereof.

And sections thirteen and fourteen read as follows:

"Section Thirteen. The rights and privileges herein conferred upon said St. Louis Electric Terminal Railway Company are granted on the express condition that should the St. Louis Electric Bridge Company fail to build a bridge across the Mississippi river from a point near Venice, in the State of Illinois, to a point in St. Louis, connecting said railway with the lines of railway of the Illinois Traction System within five years from the date of the passage and approval of this ordinance, then the rights and privileges herein granted shall cease and determine; provided, however, that should the St. Louis Electric Bridge Company be prevented or delayed in building said bridge within said time, either by the act of God, labor strikes or any injunctions or restraining order of any court, then the time shall be extended for a period equivalent to such delay.

"Section Fourteen. It is understood and agreed that the St. Louis Electric Bridge Company shall file its written acceptance of this ordinance, and will at the time of such acceptance enter into and give to the city of St. Louis a bond in the penal sum of one hundred thousand dollars, to be approved by the mayor and council, conditioned that the St. Louis Electric Bridge Company shall build and construct a bridge across the Mississippi river as authorized by the Act of Congress approved on the fifteenth day of February, nineteen hundred and seven, and shall complete said bridge within the time mentioned in section Thirteen of this ordinance, conditioned also that should the St. Louis Electric Bridge Company build said bridge within the

time as herein specified, then said bond shall be null and void; otherwise, to remain in full force and effect.''

In May, 1907, respondent railway company undertook to agree with relators upon the price to be paid them for the lot of ground in controversy, but was unsuccessful; and, on June 22, 1909, in pursuance to its charter powers, said company filed a suit in the circuit court of the city of St. Louis, which had for its purpose the condemnation of this land.

The relators filed an amended answer, in which they denied some of the allegations in the petition, but did not deny the filing of the map of the route, that the railroad would lie wholly within the city of St. Louis, or the ownership of the lot, or that plaintiff offered to purchase relators' lot and was refused, or that petitioners' real intention was to construct and operate a railroad under the general law for the carriage of freight and passengers within the city of St. Louis, or to act as a terminal line; and for further answer charged that the only power or authority of respondent Railway Company to construct or operate a railroad in the city of St. Louis of any kind was that conferred by the ordinance, approved April 6, 1907, already noticed, and that it merely authorized the construction, maintenance and operation of a street railroad by respondent railway company under the powers conferred by article 3, chapter 12, of the Revised Statutes of Missouri, 1899, concerning street railways, and had no power whatever to exercise the right of eminent domain or to take the lot of relators under any power it possesses, nor has any other street railway company. The cause came on for hearing on January 20, 1909, before Judge G. H. Willams, in vacation, and respondent railway company offered in evidence its articles of association and the said ordinance of the city of St. Louis, approved April 6, 1907, already mentioned.

R. D. Smith, on behalf of respondent company, testified that he was the manager and representative

of petitioner in Missouri. He testified to the existence of the Illinois system and named the four electric roads that composed it, and their location at Venice, opposite St. Louis; that the St. Louis Electric Bridge Company has a bridge under construction to connect respondent railroad with the Illinois system, and has a large landed property in St. Louis, near its terminus, and that the tracks of respondent railway company have been laid on a large number of streets in the city of St. Louis; that the bridge company, the respondent railway company's railroad, are subsidiary companies of the Illinois system, and they were carrying passengers, freight, baggage and express matter, and arranged for freight and all sorts of freight and express matter, and have regular cars for long-distance travel. And that the property sought to be condemned here is to be used to erect depots and places to receive freight and passengers and express in the city of St. Louis.

On August 22, 1909, the court rendered an interlocutory decree of condemnation and appointed respondents Kinsey, Hufft and Darst, commissioners, as before stated, to assess compensation to relator, Rosalie Greffet, for her lot. In the decree the court states that it finds and decides that respondent railway company was organized under article 2, chapter 12, Revised Statutes 1899, "and as such corporation was organized for the purpose of being used and operated in connection with and as a part of said Illinois system . . . and that the petitioner is authorized to and is constructing it for the purpose of transporting freight and passengers in connection with said Illinois system and the bridge, and the condemnation of relators' lot is necessary for the public uses described in the petition." He also adjudged that respondent railway company is entitled to take and hold the property for the public use so specified in connection with its business as a public carrier in the transportation of freight and passengers on its said railroad and to furnish room for

. . . freight yards and terminal facilities upon making compensation.

The commissioners qualified and proceeded to act as such until August 6, 1909, when they were stopped from further action by the preliminary writ of prohibition issued from this court on August 5, 1909.

Upon this state of the record, counsel for respondents moves this court to quash the preliminary writ of prohibition issued, and to dismiss relators' petition filed herein.

I. If we correctly understand the position of counsel for relators, it is this: that the respondent railway company is a general railroad corporation organized, incorporated and existing under and by virtue of article 2, of chapter 12, Revised Statutes 1899; and, as such, has no authority to construct and maintain its railroad tracks in, upon and across the streets of the city of St. Louis, or to operate its motors and cars therein, without express authority from the city to do so. And relators insist that the city has not authorized the respondent company to so construct its tracks and to so operate its cars. Consequently, they contend that the respondent company has no authority to construct, maintain or operate a railroad over, along or across the streets of the city of St. Louis; or to condemn land in said city for its use, nor had Judge Williams jurisdiction to do so.

It seems to us that counsel for relators are led into error by attaching undue importance, at this time, to the ordinance of the city, before mentioned, approved April 6, 1907.

The respondent company was organized under article 2 of chapter 12, Revised Statutes 1899, and derives its authority from the State of Missouri to condemn lands for railroad purposes, and not from the city of St. Louis, or from any other municipality into which it may desire to enter. [Metropolitan Ry. Co. v. Chicago West Division Ry. Co., 87 Ill. 317.]

There is no law requiring a railroad company to first procure the consent of a municipality to the use of its streets as a prerequisite to its legal right to condemn private property for railroad purposes. [California Southern Ry. Co. v. Kimball, 61 Cal. 90.]

Suppose, for instance, the ordinance approved April 6, 1907, had never been enacted, could it then be seriously contended that the respondent company would have no power or authority to condemn relators' property, just as it is now undertaking to do? We think not, for the reason that the consent of the city might be obtained after condemnation as well as before. [Metropolitan Ry. Co. v. Chicago West Div. Ry. Co., supra.]

While it is true, the respondent cannot use the streets of the city without it is duly authorized to do so; and it might for that reason be unable to reach, use and occupy the property so condemned by it for railroad purposes, however, that is a matter which does not concern relators, for the reason that their land cannot be taken until paid for, and then it can be used for no other purpose than for the purposes for which it was condemned. The sole purpose of a condemnation proceeding is to acquire private property for public use; and the plaintiff therein does not thereby undertake to acquire the right to use the streets of a city or to use and occupy the public roads and highways in the country. The Supreme Courts of California and Illinois have both expressly held, that the question as to whether or not the consent of the city to use the streets thereof has been obtained is wholly immaterial in a proceeding to condemn private property, situate therein, for the public use of a legally organized railroad company. [California Southern Ry. Co. v. Kimball, 61 Cal. 90; Metropolitan Ry. Co. v. Chicago West Div. Ry. Co., 87 Ill. 317.]

We are, therefore, of the opinion that said position of counsel for relators is not well founded.

II. Counsel for relators, more by way of insinuation than by direct assertion, contend that the respondent company has no power or authority to condemn private property for railroad purposes, under article 2, chapter 12, Revised Statutes 1899, for the reason that it is not a railroad company within the meaning of said article, but is an interurban electric railroad company, which is not embraced within the provisions of that article.

Without stopping to decide that proposition, it is sufficient to state that whatever doubt existed at one time as to that mooted question has been set at rest by an act of the Legislature, approved March 19, 1907. By that act article 2 of chapter 12, Revised Statutes 1899, entitled "Railroads," was amended (Laws 1907, p. 174) by adding thereto a new section, numbered 1174a, which reads as follows:

"That any corporation now existing, or that may hereafter be incorporated, for the purpose of constructing, building, owning, operating and maintaining an interurban electric railroad, shall have and possess the same rights and be subject to the same liabilities and shall be governed by the same powers, laws, limitations, restrictions and proceedings now governing railroads in article 2 of chapter 12 of the Revised Statutes of Missouri of 1899, for the condemnation of lands for right of way, and the fencing thereof."

This section is *in pari materia* with articles 2 and 7 of chapter 12, Revised Statutes 1899, containing the law of eminent domain for steam railroads, and in express terms grants to interurban railroad companies all the powers possessed by steam railroad companies to condemn property for their use. This rule is announced in the following cases: Malott v. Railroad, 108 Fed. 313; Gaston v. Lamkin, 115 Mo. l. c. 33; State ex rel. v. Dearing, 173 Mo. l. c. 504; Sales v.

Barber et al., 166 Mo. l. c. 671; State ex rel. v. Patter-son, 207 Mo. 129.

We, therefore, rule this contention against re-lators.

III. As before stated, counsel for relators lay much stress upon the fact that the record discloses no authority outside of the ordinance before men-tioned, approved April 6, 1907, authorizing the re-spondent company to construct its tracks upon, along and across the streets of the city, or to operate its cars thereon; and insist that said ordinance, the one under which said respondent proposed to operate, does not authorize it to operate an interurban railroad in said city, which it proposes to do, but only a street railroad, which can only be organized and operated under article 3 of chapter 12, Revised Statutes 1899. In other words, counsel for relators contend that the record shows that the respondent company is organized as an interurban railroad company under article 2 of chapter 12, Revised Statutes 1899, as amended by said Act of 1907; and notwithstanding that fact, it proposes to operate such road within the limits of the city of St. Louis under said ordinance, yet in violation of its express provisions, by transporting freight in freight trains to be operated thereon, which is not authorized to be done by said ordinance.

Counsel for respondents concedes that the re-spondent company is an interurban railroad company and not a street railroad company, and claims that it has the right to operate freight and passenger trains over the same under the ordinance aforesaid.

In answer to that contention, it is sufficient to say that it will be ample time to determine that question when the respondent company undertakes to do so. If it should attempt to run freight trains and trans-port freight over said road in violation of said ordi-nance, as is contended for by counsel for relators, then

there is ample authority to prevent such usurpation of power. That question, however, is not and cannot be considered or adjudged in this case, and we decline to consider the same, much less undertake to pass upon it.

The court expressly held in the case of Kansas & Texas Coal Ry. v. Northwestern Coal & Mining Co., 161 Mo. 288, that the power of a regularly organized and chartered railroad company chartered for "the purpose of constructing and operating a railroad for public use in the conveyance of persons or property" to condemn land for a right of way for a railroad track cannot be drawn in question in a condemnation proceeding.

The same principle is announced in the following cases: National Docks Co. v. Railroad, 32 N. J. Eq. 755-760; Ulmer v. Lime Rock Ry. Co., 66 L. R. A. l. c. 395; Sewall's Falls Bridge v. Fisk, 23 N. H. 171; Metropolitan Ry. Co. v. Chicago West Div. Ry. Co., supra.

There are many other questions presented and ably discussed by counsel for both parties, but the proper disposition of none of them would change the results before stated, and for that reason we deem it unnecessary to prolong this opinion by deciding them.

We are, therefore, of the opinion that the preliminary writ of prohibition should be quashed and the permanent writ be denied, and that the petition filed herein should be dismissed. It is so ordered. All concur except *Gantt, J.*, who dissents.

## DISSENTING OPINION.

GANTT, J.—I cannot concur in the views of my brethren. Conceding that the circuit court is a court of general jurisdiction and under the general statutes has jurisdiction of proceedings to condemn private

227 Sup—4

property for public use, and conceding moreover that
a railroad is for public use and that the St. Louis
Electrical Railway Company is organized under the
steam railway law with authority to transport persons
and property, still inasmuch as the property of relator
is situated in the city of St. Louis and the municipal
assembly of said city has only granted said company
the right to operate "a street railway" in said city,
and inasmuch as the Constitution of this State (1875),
section 20 of article 12, provides: "No law shall be
passed by the General Assembly granting the right
to construct and operate a street railroad within any
city, town, village, or on any public highway, without
first acquiring the consent of the local authorities hav-
ing control of the street or highway proposed to be
occupied by such street railroad; and the franchises so
granted shall not be transferred without similar assent
first obtained," and inasmuch as defendant applied for
and obtained consent only to lay down, construct,
operate and maintain a street railway, I am of the
opinion it is now estopped from repudiating the only
authority it has for occupying the streets of St. Louis,
and that for the purposes of this condemnation pro-
ceedings it must be held and adjudged to be a street
railway only and cannot fall back on its charter as a
standard steam railroad as authority to condemn.

In St. Louis Railroad Company v. South St. Louis
Railroad Co., 72 Mo. l. c. 67, 68, it was ruled that "the
entire grant of legislative power is subject to the con-
dition" prescribed in article 12, section 20, of the Con-
stitution, and the charter of St. Louis adopted in
1876 under express constitutional grant is in perfect
harmony with this constitutional grant, and it pro-
vides that the Municipal Assembly shall have power
by ordinance to determine all questions with refer-
ence to street railroads within said city, involving the
right to construct street railways, granting the right
of way and controlling them after completion. This

constitutional and charter power was but the confirmation of an act of the General Assembly of Missouri amending the charter in 1856, giving the same power and control over street railways. While this court in State ex inf. v. Lindell Ry. Co., 151 Mo. 162, reaffirmed this right, it overruled the case in 72 Mo. 67 insofar that this case held that the Act of 1860 in regard to parallel lines was not repealed by the subsequent Act of 1866 and by the Constitution. The question was before this court in St. Louis and Meramec Rd. Co. v. Kirkwood, 159 Mo. 239. In that case a railroad company organized under the general railroad act, just as the St. Louis Electric Terminal Railway Company in this case is, obtained from the city council of Kirkwood a franchise to operate its cars in the streets of that city; to construct and operate an electric railroad for the transportation of passengers on, along, and upon certain streets. Thereafter it proceeded to carry freight and to use the streets for loading and unloading express matter, and the city by ordinance forbade the use of its streets for such purposes, and the railroad sought to enjoin the city from enforcing said ordinance, contending that while it accepted the same and had no right to construct and maintain its railroad on said streets without first acquiring the consent of the authorities, it could not bind itself to exercise only a part of the powers committed to it by the State, or make a valid contract not to exercise part of the franchise granted to it for the public use, and the city could not impose the condition that it should exercise only a portion of its franchise powers and the ordinance was void, but this court unanimously said that the veto power given by the Constitution and section 2543, Revised Statutes 1889 (now section 1035, R. S. 1899, amended, but not in this regard), was not limited to a mere "yes" or "no," but the city can impose such conditions upon its consent as it sees fit. [Railroad v. Railroad, 148 Mo. 637;

Railroad v. Railroad, 148 Mo. 665; Railroad v. Railroad, 105 Mo. 571.] In that case it was further said, "It does not admit of doubt, in our opinion, that the city of Kirkwood could have altogether denied plaintiff the right to operate its road in said city, and it would have been utterly powerless to have forced its way into said city without its consent. . . . We think the facts in evidence constituted plaintiff, so far as the city of Kirkwood is concerned, a street railway with the right to transport passengers only, and that, in operating mail and express cars, it exceeded the grant of the city," and thus made itself amenable to the ordinance. In this case the St. Louis Terminal Electric Railway Company tendered evidence that it was a part of a system of interurban railways. With that I think we are not concerned. The franchise granted is to a railway wholly within the city of St. Louis. It gave authority to construct or operate a street railway, not an interurban system. A street railway is defined in Hannah v. Metropolitan Street Ry. Co., 81 Mo. App. 82, in these words: "As the name indicates, the primary meaning of street railway, or street railroad, is one constructed and operated on and along the streets of a city or town for the carriage of persons from one point to another in such city or town or to and from its suburbs. It is peculiarly an institution for the accommodation of people in cities and towns; its tracks are ordinarily laid to conform to street grades; its cars run at short intervals, stopping at street crossings to take on and discharge passengers, and in its business is confined to the carriage of passengers and not freight." The difference between a railroad and a street railroad in both a technical and popular sense is marked. [Railroad v. Johnson, 2 Wash. 112; Railroad v. Railroad, 63 Ky. 175.] In a legal sense a street railway is not included within the statute authorizing the condemnation of lands for railway purposes. [Thomson-Houston

Electric Co. v. Simon, 10 L. R. A. 251; Heilman v. Railroad, 180 Pa. St. 627.]    With profound respect for the opinion of my brethren, I think the St. Louis Electric Terminal Railway Company should and must be regarded as a street railway by the very terms of the franchise it sought and obtained from the city; that it was unanimously so ruled in Ry. Co. v. Kirkwood, 159 Mo. 239. It was so held in Sams v. St. Louis & M. R. Rd. Co., 174 Mo. 53. In my opinion the circuit court has no jurisdiction to condemn the lot of relators; that this goes to the jurisdiction of the subject-matter of the suit, and is not waived by failure to demur or raise the want of jurisdiction by answer. [Railroad v. Calkins, 90 Mo. 1. c. 545; Railroad v. Baker, 102 Mo. 553; 31 Cyc. 860; Henry v. Railroad, 121 Ill. 264; State ex rel. v. Oliver, 163 Mo. 679.]

In support of the majority opinion authority for this condemnation is deduced from section 1174a, which provides "that any corporation now existing or that may hereafter be incorporated, for the purpose of constructing, building, owning, operating and maintaining an interurban *electric* railroad, shall have and possess the same rights and be subject to the same liabilities and shall be governed by the same powers, laws, limitations, restrictions and proceedings now governing railroads in article 2 of chapter 12, Revised Statutes 1899, for the condemnation of lands for right of way, and the fencing thereof." That being *in pari materia* with articles 2 and 7 of chapter 12, Revised Statutes 1899, it conferred upon interurban railroads all the power granted to steam railroads to condemn property, but as I view it, this statute does not and cannot apply to the St. Louis Electric Terminal Railway Company because said company by the very terms of its charter lies wholly within the city of St. Louis and hence is not interurban, and its grant must be construed strictly in favor of the public, and section 1035, Revised

Statutes 1899, which is a part of said company's charter as much as if it had been written therein, provides that "nothing herein contained . . . shall be construed to authorize the construction of any railroad not already located in, upon, or across any street in a city or road of any county, without the assent of the corporate authorities of said city, or the county court of such county." Thus the inhibition applies to steam and electric railway companies as well as to street railways *eo nomine,* and the city of St. Louis had the power to refuse to permit a steam or electric railway to occupy or cross its streets except on such conditions as it saw fit to impose, and it gave this company the right to use its streets upon the express condition that it should operate only a street railway company therein and thereon. Having obtained this right to construct and operate a street railway only, it now seeks to exercise the right of eminent domain as a steam or interurban railroad, and appropriate relators' lots. The right of eminent domain is the exercise of sovereign power and the company seeking to enforce such power should be able to put its finger upon the authority granted it to do so.

It is said in the majority opinion that the relators cannot question the failure to obtain consent of the city to authorize the company to construct and operate an interurban railway on its streets and that it is wholly immaterial whether or not the consent of the city has been obtained in a proceeding to condemn private property for the reason that the State has conferred that authority in the charter of the company. I respectfully dissent from this view, in view of the express constitutional provision in section 20 of article 12 and section 1035, Revised Statutes 1899, which requires the consent of the city to the construction and operation of street railways on its streets or any other railroad thereon or across the same.

In the matter of the application of the Rochester Electric Ry. Co. to acquire lands of one Wilkins, 123 N. Y. 351, the condemnation was opposed on the ground that the assent of the local authorities of the town of Greece had not been obtained. It appears from the report of that case that the turnpike company had granted the right to the electric company to construct a railroad upon its right of way, and the company insisted that this was the only consent that was necessary. The New York statutes required that before such railroad company could construct and operate its railroads in cities, towns and villages, it was necessary to obtain the consent in writing of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having control of, that portion of a street or highway upon which it was proposed to construct and operate such railroads. The court held that the local authorities in the meaning of that statement meant the officers of that city, town or village whose duties and powers relate to the supervision and maintenance of streets and highways and that the turnpike corporation was not a local authority within the meaning of the act. Speaking for that court Judge GRAY said: "The next phase of the question, which presents itself then, is, if the consent of the highway commissioners, as the local authorities having control over the highway in question, has not been obtained, is that consent an essential prerequisite to the right to maintain this proceeding? That would seem to be the inevitable conclusion, based upon the language of the statute, in its plain reading, and it is, I think, fortified by reasoning and by authority. The authority conferred by the Act of 1884 is to construct and operate the railroad through the street or highway, and to acquire private property for that purpose, provided that the consents of the property-owners and the local authorities be first obtained. The language imports a condition to the right of the company to pro-

ceed, after its organization, in the work of construction. The consents which are to be first obtained are to the construction and operation of any railroad at all, as proposed. Its condition, after the work of formal organization is complete, is still an incomplete or imperfect one. The Legislature, in the general law of 1884, followed the constitutional requirements as to the consents to be obtained from property-owners and from the local authorities. The design of the people, as manifested in the Constitution and again in this act, was to guard the public generally against these invasions of streets and highways by railways under authority of legislative grants, and the protection was provided for by the imposition of the conditions, in every case of a projected street railroad, that the project should be approved by the local authorities and by a certain proportion of property-owners; with the permission, if the requisite consents of the property-owners were refused, to apply to the court, whose determination might stand as a substitute for such consents. Sufficient vitality and strength to go on with and to construct a railroad do not exist in the newly-formed corporation, until infused by the consents of the local authorities and property-owners. Until that moment, when the company can assert that the statutory conditions of its right to be and to do are fulfilled, it cannot strictly, nor justly, be said that it is in a position legally to deprive the landowner of his property. By organization under the act it has become a corporation, but with no authority as yet to construct and operate a railroad upon a street or highway. Its right to the exercise of that franchise is still inchoate and does not become a vested right, until after the consents specified by the statute have been obtained. It may be a corporation, but it has no power to take a step in the direction of occupying the street or highway, because it is, in effect, inhibited by the condition of its

charter from doing so, while the consents to the appropriation of the street or highway to railroad uses are lacking. [Wis. Water Co. v. Winans, 85 Wis. 26; Railroad v. Railroad, 179 Pa. St. 584.]"

In my opinion, this is a clear and proper interpretation of the Constitution and the statutory law of this State on this subject. Without the consent of the city of St. Louis to the construction of the St. Louis Electric Terminal Railway as a steam railway or as an interurban railway, it has no power to construct and operate anything but a street railway, as the ordinance conferred that right and no other; and as a street railway, in my opinion, it has no authority to exercise the power of eminent domain. As said by the Supreme Court of Pennsylvania in Heilman v. Ry. Co., 180 Pa. St. 627, "Street railway companies are not endowed with the right of eminent domain, because they do not need it. They are modern local conveniences, the location and construction of which are subject to the will of the public they are intended to serve. This will is expressed through the local authorities. Such companies cannot force themselves into neighborhoods where they are not wanted." And the same doctrine was announced in Thomson-Houston Electric Company v. Simon, 20 Ore. 60.

For these reasons I think the writ of prohibition should be made absolute. *Burgess* and *Fox, JJ.,* concur in my views.